**NOT FOR PUBLICATION**

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

FRESNO DIVISION

| | |
|---|---|
| Darren Willie, | No. 1:07-CV-156-SRB (PC) |
| Plaintiff, | **ORDER** |
| vs. | |
| Dr. Vo; Dr. Tate; W.J. Sullivan, | |
| Defendants. | |

The Court now considers Defendant William J. Sullivan's Motion for Summary Judgment ("Sullivan's Mot."), Defendant Harold Tate's Motion for Summary Judgment ("Tate's Mot."), and Defendant T. Vo's Motion for Summary Judgment ("Vo's Mot."). (Docs. 52, 55, 56).

**I.    BACKGROUND**

**A.    Plaintiff's Relevant Treatment**

Plaintiff is an inmate currently incarcerated at California Correctional Institution in Tehachapi, California ("CCI-Tehachapi"). (Def. Sullivan's Mem. of Points & Authorities in Supp. of Sullivan's Mot. ("Sullivan's Mem.") at 1; Second Am. Compl. ¶ 4.) Defendant William J. Sullivan is the former warden of CCI-Tehachapi, a position he held at all relevant times for the purposes of this case. (Sullivan's Mem. at 1-2.) Defendant Harold Tate, M.D.,

1  is a licensed physician and surgeon in the state of California who was employed at all
2  relevant times as Chief Medical Officer at CCI-Tehachapi. (Def. Tate's Mem. of Points &
3  Authorities in Supp. of Tate's Mot. ("Tate's Mem.") at 1.) The position of Chief Medical
4  Officer was largely administrative, and Dr. Tate did not typically provide medical treatment
5  to patients in this role; before working with the California Department of Corrections and
6  Rehabilitation ("CDCR"), Dr. Tate's medical practice focused on orthopedics and neurology.
7  (*Id.*) Defendant T. Vo, M.D., is a physician at CCI-Tehachapi who treated Plaintiff on a
8  handful of occasions during the relevant time period, for headaches and/or a left knee injury.
9  (Vo's Mot. at 2.)

10  The first time Plaintiff saw Dr. Vo, in June 2006, he complained of headaches. (Vo's
11  Mot., Ex. B, Willie Dep. 14:7-18, May 6, 2009.) Dr. Vo performed a physical examination
12  of a "knot" on Plaintiff's head that Plaintiff thought might be causing the headaches. (*Id.* at
13  14:19-15:3.) Dr. Vo informed Plaintiff that the knot was a lipoma, which could not cause
14  headaches. (*Id.* at 14:21-23.) According to Plaintiff, Dr. Vo told him that he might require
15  a CAT scan or an MRI in the future, to determine the cause of the headaches, but at that first
16  visit, Dr. Vo prescribed pain medication and said that if the headaches persisted, he would
17  order further tests. (*Id.* at 15:1-8.) Plaintiff continued to have severe headaches, which were
18  not substantially alleviated by Ibuprofen. (*Id.* at 16:9-25.) Plaintiff testified that he mentioned
19  his knee injury to Dr. Vo at the first visit, but because it had not been listed on his "sick call
20  slip," Dr. Vo told him he would have to fill out another slip and make another request to see
21  a doctor. (*Id.* at 18:4-13.)

22  Plaintiff saw Dr. Vo for the second time in August 2006, complaining of left knee
23  pain. (*Id.* at 26:3-13.) Plaintiff told Dr. Vo that he had injured his left knee during a
24  basketball game at a different prison, Lancaster State Prison, and had been diagnosed with
25  damage to his anterior cruciate ligament ("ACL") and meniscus. (*Id.* at 27:16-17; *see
26  also* Second Am. Compl. at 49.) Plaintiff had surgery on his knee in December 2001, and he
27  attached the surgeon's report to his Second Amended Complaint. (Second Am. Compl. at
28  49.) However, Plaintiff acknowledges that a number of documents were missing from the

medical file Dr. Vo had to review at the second visit. (Vo's Mot., Ex. B, Willie Dep. 50:2-7.) When Plaintiff informed Dr. Vo of his knee surgery and his lingering pain, in August 2006, Dr. Vo prescribed pain medication and a "chrono" assignment for Plaintiff to receive a bottom bunk, but did not order any diagnostic tests or other treatment. (*Id.* at 50:21-51:1.)

The surgeon's report states that Plaintiff had arthroscopy of his left knee in December 2001, during which the surgeon noted "a radial tear of the posterior horn of the lateral meniscus, which was resected back to a stable rim." (Second Am. Compl. at 49.) The surgeon also observed a tear of Plaintiff's ACL, with "only a remnant and a stump of tissue remaining." (*Id.*) The stump was debrided, but it could not be repaired during that procedure. (*Id.*) The surgeon stated, "Mr. Willie will most likely eventually need ACL reconstructive surgery." (*Id.*) However, the second procedure was not performed at that time because Lancaster State Prison was in a lockdown, and Plaintiff's knee injury was determined not to be a life-threatening situation. (Vo's Mot., Ex. B, Willie Dep. 28:13-29:6.) Plaintiff was subsequently released from state custody on January 6, 2003, and he was out of prison for a short period of time. (*Id.* at 29:9-13; 73:19-24.) Plaintiff's parole officer attempted to arrange a second surgery for Plaintiff's knee, but ultimately, Plaintiff did not seek or obtain any medical care for his headaches or his knee while he was out of custody. (Sullivan's Mot., Ex. B, Willie Dep. 44:7-12.)

Plaintiff saw Dr. Vo a third time in September 2006, after filling out a sick call slip related to his continuing headaches. (*Id.* at 51:8-14.) Plaintiff told Dr. Vo that his headaches were severe and pounding, and Plaintiff testified in his deposition that at this point, Dr. Vo ordered an MRI of Plaintiff's head, to try to determine the cause of the headaches. (*Id.* at 51:17-20.) However, the medical records attached to the Second Amended Complaint reveal that the MRI Plaintiff received on January 10, 2007, four months after the referral, was of his left knee. (Second Am. Compl. at 50.) This test showed a "[c]hronic complete tear of the anterior cruciate ligament." (*Id.*) Around the same time, Plaintiff received results from what he believed was an MRI of his head, which revealed that his headaches were due to sinusitis.

(Vo's Mot., Ex. B, Willie Dep. 58:19-59:1.) Plaintiff was prescribed Sudafed, which helped with his headaches. (*Id.* at 59:3-21.)

### B.    Plaintiff's Relevant Grievances

CCI-Tehachapi has a review system with one informal level of review and three formal levels of review. (Tate's Mem. at 1.) At the informal level, the inmate is to attempt to resolve the issue with the staff person involved. (*Id.*) At the first formal level of review for a medical grievance, the grievance is forwarded to the medical department, where a medical staff-person responds, typically after interviewing the inmate. (*Id.*) The grievance is forwarded to the Chief Medical Officer for preparation of a response at the second formal level of review. (*Id.* at 1-2.) When a grievance goes to the third formal level of review, a response is prepared by the head of the Inmate Appeals Branch of the CDCR. (*Id.* at 2.)

At the informal level of review, Plaintiff's first relevant grievance, dated April 4, 2006, stated that he had high blood pressure and severe headaches, and he requested a visit with a doctor and a specialist. (Second Am. Compl. at 33.) His grievance was granted on April 7, 2006: the appeal form attached to the Second Amended Complaint states that he will have his blood pressure checked twice a week and see a doctor in two weeks. (*Id.*) Plaintiff continued to the first formal level of review, arguing that his blood pressure was being checked, but as of April 23, 2006, he still had not seen a doctor. (*Id.*) In response, Dr. Vo examined Plaintiff, as discussed above, in June 2006. (*Id.* at 34.) The appeal form states, "Based on the exam, the appellant has a small lemon size[d] lump. . . . He was diagnosed with a small lipoma at the top of his head and no treatment offered for cosmetic reasons." (*Id.*) Plaintiff's request to see a specialist was denied. (*Id.*) Plaintiff was still unsatisfied and filed another appeal, stating on June 24, 2006, "I was diagnosed with a small lump (lipoma) which requires surgery. I still have headaches, because possibly of this lump under my scalp." (*Id.*)

Dr. Tate wrote the response to the second level of review. (*See id.* at 34, 37.) Dr. Tate reviewed Plaintiff's medical records and concluded that Dr. Vo treated Plaintiff appropriately. (*Id.* at 37.) Dr. Tate wrote, "Lipoma is a fatty deposit and has no connection

- 4 -

to underline [*sic*] tissue. Hence, it is not capable of causing headaches and is considered cosmetic in nature." (*Id.*) Dr. Tate explained that the CDCR does not provide cosmetic surgical procedures for inmates. (*Id.*) As such, Plaintiff's grievance was denied at the second level as well, on August 1, 2006. (*Id.*) In his second level grievance regarding the lipoma, Plaintiff added complaints about his left knee, for the first time. (*Id.* at 35-36.) Dr. Tate noted in his response to the first grievance that "no additional issues are to be added to an appeal in the middle of the process." (*Id.* at 37.) Plaintiff appealed to the director level as well, and in a decision dated October 16, 2006, the appeal was denied. (*Id.* at 38.) The Chief of the Inmate Appeals Branch agreed with Dr. Tate's assessment that Plaintiff had been treated appropriately by Dr. Vo and wrote, "It is not appropriate for the appellant to self-diagnose his own problems and then expect a medical doctor to implement the appellant's recommendation for a course of medical treatment." (*Id.*)

Plaintiff initiated another grievance with respect to his continuing headaches, in which he requested diagnostic testing, on October 22, 2006. (*Id.* at 40.) The records attached to the Second Amended Complaint do not reveal what became of the second grievance related to Plaintiff's headaches, although he did obtain an MRI and a diagnosis of sinusitis in early 2007, as mentioned above.

On December 5, 2006, Plaintiff initiated a grievance regarding his knee pain. (*Id.* at 41.) This grievance bypassed the informal level of review and, after an interview with a staff member, Naprosyn was ordered for Plaintiff's pain, but his requests for surgery, transfer, and physical therapy were denied on January 25, 2007. (*Id.* at 47.) Plaintiff included his post-surgical report from 2001 with his appeal, and after reviewing it and the MRI results from January 2007, J. McConnell, a nurse practitioner at the prison, referred Plaintiff to a specialist in February 2007. (*Id.*) However, on March 7, 2007, Dr. Tate denied Plaintiff's request for surgery, transfer, physical therapy, a knee brace, and an ace wrap, and cancelled the referral to a specialist. (*Id.* at 51.) Dr. Tate noted in his decision that Plaintiff had been clinically stable for six years and had undergone several physical examinations of his joints, which were normal. (*Id.*) Since the surgical report and MRI results showed a chronic

condition, Dr. Tate wrote, surgical intervention was not clinically warranted. (*Id.*; *see also* Decl. of Howard Tate in Supp. of Tate's Mot. ("Tate Decl."), Ex. D.)

Shortly thereafter, on March 20, 2007, Plaintiff filed another grievance in which he requested to see an orthopedic specialist. (Decl. of K. Sampson in Supp. of Tate's Mot. ("Sampson Decl."), Ex. C at 1.) At the first formal level of review, NP McConnell wrote on June 21, 2007 that Plaintiff's referral had been cancelled by Dr. Tate, on account of his conclusion that Plaintiff's knee condition was chronic and did not require further treatment or surgery. (*Id.* at 4.) Dr. Tate conducted the second level of review on October 21, 2007, in which he reiterated his conclusion that Plaintiff did not require surgical intervention and denied Plaintiff's requests. (*Id.* at 5.) Dr. Tate wrote,

> The operative report of 12/13/01 reveals that the surgeon shaved off the residual stump of the already completely torn [ACL] at that time. The appellant has thus been managing his activities of daily living without an ACL for six years. This is somewhat reminiscent of the two-time National Football League Denver Broncos quarterback John Elway, who played his entire professional football career without one. There is no medical justification for urgent surgery; nor is there any medical need for monthly attention to this knee, which has been doing well for six years without it.

(*Id.*) Finally, on March 19, 2008, in response to another grievance related to Plaintiff's knee, his requests were partially granted. (Sampson Decl., Ex. D.) Plaintiff was given a permanent assignment to a lower tier, lower bunk, and he was referred to an orthopedist, with evaluations in the prison medical clinic every thirty days. (*Id.*) Plaintiff did not appeal this grievance. (Tate's Mem. at 8.) Plaintiff states in his Opposition to Dr. Tate's Motion that he ultimately received a second knee surgery in April 2008. (Pl.'s Opp'n to Tate's Mot. at 3; Def. Tate's Reply at 5.)

Plaintiff filed the instant lawsuit on January 29, 2007. (*See* Doc. 1.) His Second Amended Complaint was filed on July 16, 2007. (Doc. 18.) Plaintiff claims that the Defendants' actions with respect to his headaches and his knee pain constitute a violation of his rights under the Eighth Amendment to the U.S. Constitution and 42 U.S.C. § 1983.

## II.   LEGAL STANDARDS AND ANALYSIS

### A.   Summary Judgment

- 6 -

The standard for summary judgment is set forth in Rule 56(c) of the Federal Rules of Civil Procedure. Under Rule 56, summary judgment is properly granted when: (1) no genuine issues of material fact remain; and (2) after viewing the evidence most favorably to the non-moving party, the movant is clearly entitled to prevail as a matter of law. Fed. R. Civ. P. 56; *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Eisenberg v. Ins. Co. of N. Am.*, 815 F.2d 1285, 1288-89 (9th Cir. 1987). A fact is "material" when, under the governing substantive law, it could affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A "genuine issue" of material fact arises if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id*.

In considering a motion for summary judgment, the court must regard as true the non-moving party's evidence, if it is supported by affidavits or other evidentiary material. *Celotex*, 477 U.S. at 324; *Eisenberg*, 815 F.2d at 1289. However, the non-moving party may not merely rest on its pleadings; it must produce some significant probative evidence tending to contradict the moving party's allegations, thereby creating a material question of fact. *Anderson*, 477 U.S. at 256-57 (holding that the plaintiff must present affirmative evidence in order to defeat a properly supported motion for summary judgment); *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 289 (1968).

**B.     Liability for Constitutional Violations Under § 1983**

Plaintiff argues that the failure to promptly treat his headaches and knee pain constitutes a violation of his rights guaranteed by the Eighth Amendment to the U.S. Constitution. (*See, e.g.*, Second Am. Compl. at 1.; Pl.'s Opp'n to Sullivan's Mot. at 4.) All three defendants have argued that their conduct does not amount to a constitutional violation. (Sullivan's Mem. at 5-8; Vo's Mot. at 7-11; Tate's Mem. at 9-13.)

"The Eighth Amendment protects inmates from cruel and unusual punishment, which includes the denial of medical care." *Conn v. City of Reno*, 572 F.3d 1047, 1054 (9th Cir. 2009) (citing *Estelle v. Gamble*, 429 U.S. 97, 102-03 (1976)). The Ninth Circuit Court of Appeals explained,

> When an individual is taken into custody and thereby deprived of her liberty, the officials who hold her against her will are constitutionally obligated to respond if a serious medical need should arise. If, with deliberate indifference, these officials fail to respond appropriately and instead act in a manner that will foreseeably result in harm, they violate her due process rights.

*Conn*, 572 F.3d at 1051. "An official's deliberate indifference to a substantial risk of serious harm to an inmate-including the deprivation of a serious medical need-violates the Eighth Amendment, and a fortiori, the Fourteenth Amendment." *Id.* at 1054-55 (citing *Farmer v. Brennan*, 511 U.S. 825, 828 (1994); *Frost v. Agnos*, 152 F.3d 1124, 1128 (9th Cir. 1998)). In the Ninth Circuit, a plaintiff must meet two requirements to set forth a constitutional claim under this theory:

> "[f]irst, the plaintiff must show a serious medical need by demonstrating that failure to treat a prisoner's condition could result in further significant injury or the unnecessary and wanton infliction of pain. Second, the plaintiff must show the defendant's response to the need was deliberately indifferent."

*Id.* at 1055 (quoting *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006)). The deliberate indifference portion of the analysis contains subjective and objective elements, requiring both "(a) a purposeful act or failure to respond to a prisoner's pain or possible medical need and (b) harm caused by the indifference." *Id.* (quoting *Jett*, 439 F.3d at 1096).

### 1. Serious Medical Need

The Ninth Circuit Court of Appeals, in *Conn*, stated that "a prisoner has a 'serious' medical need if the failure to treat the condition could result in further significant injury or the 'unnecessary and wanton infliction of pain.'" *Id.* (quoting *Doty v. County of Lassen*, 37 F.3d 540, 546 (9th Cir.1994)). The Defendants do not assert that Plaintiff's knee pain or headaches do not constitute serious medical needs; rather, they focus on the deliberate indifference prong of the analysis. For the purposes of this Order, the Court will assume that Plaintiff had a serious medical need.

### 2. Deliberate Indifference

To demonstrate deliberate indifference, Plaintiff must show that Defendants (1) were subjectively aware of the serious medical need and (2) that they failed to adequately respond. *Id.* at 1056. In defining subjective awareness, the Ninth Circuit Court of Appeals has

explained that a prison official must "'know[ ] of and disregard[ ] an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.'" *Id.* (alteration in original) (quoting *Farmer*, 511 U.S. at 834). Finally, to establish that a prison official was deliberately indifferent to an inmate's serious medical need, a plaintiff must show that harm was caused by the indifference. *Id.* at 1055 (quoting *Jett*, 439 F.3d at 1096). This analysis presents questions of both cause in fact and proximate causation. *Id.* at 1058-61. "[A] plaintiff's showing of nothing more than 'a difference of medical opinion' as to the need to pursue one course of treatment over another [is] insufficient, as a matter of law, to establish deliberate indifference." *Jackson v. McIntosh*, 90 F.3d 330, 332 (9th Cir. 1996) (citing *Estelle v. Gamble*, 429 U.S. 97, 107-08 (1976)). Inadequate treatment due to malpractice or even gross negligence does not constitute an Eighth Amendment violation. *Wood v. Housewright*, 900 F.2d 1332, 1334 (9th Cir. 1990).

### a.     Subjective Awareness and Failure to Respond

The three Defendants in this case had different roles in Plaintiff's treatment. Dr. Vo was the treating physician at the prison, and he assessed Plaintiff's condition and determined his treatment. (Vo's Mot. at 2-4.) Dr. Tate was the Chief Medical Officer for the prison where Plaintiff was, at all relevant times, incarcerated, and he reviewed Plaintiff's records and grievances to evaluate whether he needed continuing care. (Def. Tate's Sep. Statement of Undisputed Facts in Supp. of Tate's Mot. ("Tate's SOF") at 1-4.) Mr. Sullivan was the warden at CCI-Tehachapi, and Plaintiff claims he sent a letter to Mr. Sullivan to complain about the denial of an MRI and further treatment for his knee, which went unanswered. (Sullivan's Mem. at 7.)

### (1)     Dr. Vo

With respect to Dr. Vo, Plaintiff asserts that his claims arise from a failure to expeditiously order diagnostic tests for his headaches and knee pain. (Second Am. Compl. ¶¶ 11, 13-22; *see also* Pl.'s Opp'n to Vo's Mot.) At the time of Plaintiff's first visit with Dr. Vo, however, there was nothing in his medical record to indicate a need for knee surgery, and

- 9 -

Plaintiff had not filled out a sick call sheet regarding knee pain. Dr. Vo determined that the lump on Plaintiff's head was a lipoma and could not be the cause of his headaches. (Vo's Mot. at 9-11; Ex. B at 14:3-16:8, 49:17-50:7, 72:20-73:12, 107:11-15; Ex. D ¶¶ 4-5.) Dr. Vo informed Plaintiff that if the conservative treatment of his pain did not work, he would consider more tests and more aggressive treatment. (*Id.*) Based on the information available to him at the time, Dr. Vo was not subjectively aware of a serious medical condition, and his treatment of Plaintiff was not deliberately indifferent. He did not fail to respond to Plaintiff's complaints. Prescribing a conservative treatment regime for both Plaintiff's headaches and his knee pain, grounded in the information contained in Plaintiff's medical records, was an appropriate treatment plan. Also, Dr. Vo ultimately ordered an MRI to determine the cause of Plaintiff's headaches, and he did not have control over how quickly it would be performed. (Vo's Mot. at 11.) Furthermore, delay in treatment, standing alone, is not enough to establish deliberate indifference. *Shapley v. Nev. Bd. of State Prison Comm'rs*, 766 F.2d 404, 407 (9th Cir 1985). Plaintiff has not established that further harm was caused by any delay in diagnosis or treatment.

### (2)    Dr. Tate

Dr. Tate is the Chief Medical Officer at CCI-Tehachapi, where Plaintiff was incarcerated at all relevant times. (Tate's SOF at 1.) At the second level of administrative grievance, Dr. Tate reviewed Plaintiff's grievances and medical records. (*Id.* at 3-4, 7-8.) The information available to him was, therefore, slightly different from that reviewed by Dr. Vo when he made his decisions. Dr. Tate agreed with Dr. Vo's assessment that Plaintiff's lipoma could not be the cause of his headaches and denied Plaintiff's "request to see a specialist, have the lipoma surgically removed, and be transferred to a medical facility[.]" (*Id.* at 7.) This decision does not reflect deliberate indifference. Dr. Tate did not address Plaintiff's knee pain at the second level appeal issued August 1, 2006, because he contends that Plaintiff

"had impermissibly added this issue in the middle of an appeal process concerning the lipoma on his head." (*Id.* at 9; Tate Decl., Ex. A at 5.)[1]

In his second decision, issued March 7, 2007, after reviewing Plaintiff's grievance related to his knee pain, Dr. Tate noted that Plaintiff's knee had been clinically stable for six years, and as his injury was a chronic condition, surgery was not warranted. (Tate Decl., Ex. C at 7.) Dr. Tate stated in his declaration that in his medical opinion, "[a] torn ACL is not a medical emergency." (Tate Decl. ¶ 14.) Dr. Tate also explained that non-surgical treatment options are appropriate if a patient's knee is stable, especially since "with each additional surgery the risk increases of developing arthritis in the knee," which can be worse than the pain of the torn ACL. (*Id.* at ¶¶ 14, 17.) Clinical indications of the need for reconstructive surgery include "instability, grinding, heat, redness, swelling, or tenderness." (*Id.* at ¶ 15.) Given Plaintiff's clinical stability, Dr. Tate determined that there was no medical justification for a second surgery. (*Id.* at ¶¶ 22-23.) This decision does not reflect a deliberate disregard for a substantial risk of serious harm to Plaintiff; as Plaintiff's knee had been stable for six years, it was reasonable under the circumstances to deny his grievance.[2]

### (3)   Mr. Sullivan

Mr. Sullivan, in contrast to the other two Defendants, is not a physician; he is the former warden of CCI-Tehachapi, a position he held during the events giving rise to this lawsuit. (Sullivan's Mem. at 2.) Plaintiff alleges in his Second Amended Complaint that he sent a letter to Mr. Sullivan on August 5, 2006, explaining that he had suffered a head injury before being incarcerated and had been experiencing severe headaches. (Second Am. Compl.

---

[1]The Court focuses on the merits of Plaintiff's claims in this Order and, as such, will not discuss Dr. Tate's arguments with respect to exhaustion of administrative remedies. However, even assuming that Plaintiff had properly raised the knee pain issue in his first grievance, Dr. Tate did not display deliberate indifference.

[2]Plaintiff ultimately underwent a second knee surgery. (Pl.'s Opp'n to Tate's Mot. at 3; Def. Tate's Reply at 5.) This fact does not establish that surgery was clinically appropriate earlier than 2008, as Dr. Tate's findings hinged on the fact that Plaintiff had been stable in the time leading up to the grievances, and clinical tests did not demonstrate any joint instability.

¶ 33.) Plaintiff's letter also described his dissatisfaction with the treatment provided by Dr. Vo and Dr. Tate's response to his grievance and requested that the warden intervene. (*Id.* at ¶¶ 34-36.) As there is no respondeat superior liability under § 1983, Plaintiff may only assert claims against Mr. Sullivan to the extent he personally committed or directed an act or omission that violated Plaintiff's constitutional rights. *See, e.g.*, *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989) ("A supervisor is only liable for constitutional violations of his subordinates if the supervisor participated in or directed the violations, or knew of the violations and failed to act to prevent them."). Therefore, Mr. Sullivan's actions with respect to the letter are the only ones that must be scrutinized here.

Mr. Sullivan states in his declaration that he does not recall receiving Plaintiff's letter, and his assistant was unable to locate it in his files. (Sullivan Decl. ¶ 5.) Mr. Sullivan further states that his usual practice with such letters was to forward them to the Health Care Manager at the prison, as he lacked medical expertise, and he believes that is what he would have done in Plaintiff's case. (*Id.* at ¶¶ 4-5.) Plaintiff has not offered any proof that the letter was delivered or that Mr. Sullivan's likely forwarding of that letter to the Health Care Manager amounts to deliberate indifference on his part. The Court concludes that Mr. Sullivan did not violate Plaintiff's Eighth Amendment rights.

### b.     **Harm Caused by Deliberate Indifference**

Even if the actions discussed above constituted a violation of his rights, Plaintiff has not demonstrated that he was harmed by the actions or inaction of any of the Defendants. In his deposition, Plaintiff stated that no doctor had told him that the delay in treatment of his headaches or his knee injury caused him to suffer any additional injury, and the record does not contain any evidence that additional harm was caused by any delays in treatment. (Swanson Decl., Ex. B at 110:5-19.) Moreover, the fact that Plaintiff did not seek or obtain any treatment for his headaches or his knee during the time he was not incarcerated undercuts his assertion that the delay in treatment at CCI-Tehachapi amounts to deliberate indifference. (*Id.* at 44:7-12.)

### III.    CONCLUSION

As the Court concludes that Defendants' actions did not violate Plaintiff's constitutional rights, it will not address Defendants' arguments with respect to qualified immunity. The standard for an Eighth Amendment violation due to inadequate medical treatment is very high. While Plaintiff may not have received treatment in as prompt and efficient a manner as he might have hoped, he was given medical care at the prison that addressed his needs.

**IT IS THEREFORE ORDERED** granting Defendant William J. Sullivan's Motion for Summary Judgment (Doc. 52).

**IT IS FURTHER ORDERED** granting Defendant Harold Tate's Motion for Summary Judgment (Doc. 55).

**IT IS FURTHER ORDERED** granting Defendant T. Vo's Motion for Summary Judgment (Doc. 56).

**IT IS FURTHER ORDERED** directing the Clerk to enter judgment in this matter in favor of Defendants.

DATED this 9th day of September, 2009.

_____
Susan R. Bolton
United States District Judge